Slip Op. 26-79

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL CIO, CLC,<br><br>Defendant-Intervenor. | Before: Gary S. Katzmann, Judge<br>Court No. 24-00263 |

## OPINION

[ Plaintiff's Motion for Judgment on the Agency Record is denied. ]

Dated: <u>July 22, 2026</u>

<u>Daniel J. Cannistra</u>, Crowell & Moring LLP, of Washington, D.C., argued for Plaintiff Bridgestone Americas Tire Operations, LLC. Also on the brief were <u>Pierce J. Lee</u> and <u>Valerie Ellis</u>.

<u>Sosun Bae</u>, Senior Trial Counsel, Commercial Litigation Branch, U.S. Department of Justice, of Washington, D.C. argued for Defendant United States. Also on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director. Of counsel on the brief were <u>Ayat Mujais</u>, Assistant Chief Counsel and <u>Samuel Childerson</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

<u>Saad Y. Chalchal</u>, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union, AFL-CIO, CLC.  Also on the briefs were Roger B. Schagrin, Luke A. Meisner, and Elizabeth J. Drake.

Katzmann, Judge:  Plaintiff Bridgestone Americas Tire Operations, LLC ("Bridgestone"), a U.S. importer of truck and bus tires from Thailand, brings this action against Defendant the United States ("the Government") to challenge the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty administrative investigation of truck and bus tires from Thailand.  See Truck and Bus Tires From Thailand: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 89 Fed. Reg. 83636 (Dep't Com. Oct. 17, 2024), P.R. 297 ("Final Determination").  This case raises two issues: (1) whether Commerce's determination to apply total adverse facts available is supported by substantial evidence and in accordance with the law and (2) whether Commerce's corroboration of Bridgestone's dumping margin is supported by substantial evidence and in accordance with the law.  Because the errors throughout Bridgestone's reporting were pervasive and because Commerce lawfully corroborated Bridgestone's dumping margin, the court denies Bridgestone's motion and sustains Commerce's Final Determination.

## LEGAL BACKGROUND

### I.    Antidumping Duties

"Dumping occurs when a foreign company sells a product in the United States at a lower price than" the company charges for the "same product in its home market."  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  This practice constitutes unfair competition because it enables foreign producers to undercut domestic companies by selling products below fair market value.  Id.  To address the impact of such unfair competition, Congress enacted the Tariff Act of 1930, as amended, which empowers Commerce to investigate potential dumping and, if necessary, to issue orders instituting duties on subject merchandise.  Id. at

1046–47.

Under 19 U.S.C. § 1673, Commerce may impose antidumping duties on "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value." "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) . . . ." U.S. Steel Corp. v. United States, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677(35)(A)). "Commerce then calculates a 'dumping margin' for a particular product subject to review, equal to 'the amount by which the normal value exceeds the export price or constructed export price.' "[1]  Id. (quoting 19 U.S.C. § 1677(35)(A)). Commerce makes various adjustments when calculating normal value and constructed export price. As relevant here, Commerce adjusts the normal value and/or constructed export price where the producer or exporter makes "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment." 19 C.F.R. § 351.102(b)(38); see also id. § 351.401(c). Additionally, Commerce reduces the constructed export price by the amount "attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery

---

[1] "The term 'constructed export price' means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under [19 U.S.C. §§ 1677a(c), (d)]." 19 U.S.C. § 1677a(b) (emphasis added). By contrast, 'export price' is the "price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States." Id. § 1677a(a) (emphasis added). Here, Commerce calculated a constructed export price for Bridgestone because "the subject merchandise was first sold in the United States . . . by a U.S. seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." See Mem. from J. Maeder to R. Majerus, re: Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand at 9 (Dep't Com. May 14, 2024), P.R. 218 ("Prelim. IDM").

in the United States," including warehousing, freight, and packing expenses.   19 U.S.C. § 1677a(c)(2)(A).

## II.      *Verification and Use of Facts Otherwise Available*

In antidumping proceedings, Commerce "obtains most of its factual information . . . from submissions made by interested parties during the course of the proceeding."   19 C.F.R. § 351.301(a).  Verification is the process by which Commerce "verif[ies] all information relied upon in making . . . a final determination" in an antidumping investigation.  19 U.S.C. § 1677m(i). "The purpose of verification is to test information provided by a party for accuracy and completeness." Goodluck India Ltd. v. United States, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (internal quotation marks and citations omitted).

Under 19 U.S.C. § 1677e(a), Commerce relies on facts otherwise available to reach the applicable determination if:

> necessary information is not available on the record, or . . . an interested party or any other person—(A) withholds information that has been requested by [Commerce] . . . , (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested . . . (C) significantly impedes a proceeding under this subtitle, or (D) provides such information but the information cannot be verified as provided in [§] 1677m(i).

19 U.S.C. § 1677e(a).  "The use of facts otherwise available . . . is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record." Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011).

If Commerce also finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. (quoting § 1677e(b)).  This is known as using "adverse facts available."  See Novolipetsk Steel Pub. Joint Stock Co. v. United States, 44 CIT __, __, 456 F. Supp. 3d 1300, 1303 n.4 (2020).

"Compliance with the 'best of its ability' standard is determined by assessing whether [the] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1677e(b)(1)); see also Deacero S.A.P.I. de C.V. v. United States, 996 F.3d 1283, 1297 (Fed. Cir. 2021).

"[W]here there is useable information of record but the record is incomplete, Commerce applies partial [adverse facts available]." Qingdao Sea-Line Int'l Trading Co. v. United States, 45 CIT __, __, 503 F. Supp. 3d 1355, 1361 (2021) (internal quotation marks and citations omitted). In contrast, "use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty." Mukand, Ltd. v. United States, 767 F.3d 1300, 1308 (Fed. Cir. 2014). Instead, "Commerce applies total [adverse facts available] when none of the reported data is reliable or usable because, for example, the data contains pervasive and persistent deficiencies that cut across the entire record."[2] Id. at 1305.

Where Commerce determines that a party's response to a request for information is insufficient, it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). "If that person submits further information in

---

[2] Though " '[t]otal adverse facts available' is not defined by statute or agency regulation[,] Commerce has used 'total adverse facts available' administratively 'to refer to Commerce's application of adverse facts available not only to the facts pertaining to specific sales for which information was not provided, but to the facts respecting all of [a] respondents' sales encompassed by the relevant antidumping duty order.' " China Steel Corp. v. United States, 43 CIT __, __, 393 F. Supp. 3d 1322, 1332 (2019) (emphasis added) (quoting Mukand, Ltd. v. United States, 37 CIT 443, 452 (2013), aff'd, 767 F.3d 1300 (Fed. Cir. 2014)). "In other words, Commerce assigns an antidumping rate based entirely on facts selected using an adverse inference, ignoring all of a respondent's information." BlueScope Steel Ltd. v. United States, 45 CIT __, __, 548 F. Supp. 3d 1351, 1355 (2021).

response to such deficiency" and Commerce "finds that such response is not satisfactory" or was "not submitted within applicable time limits," then Commerce may "disregard all or part of the original and subsequent responses." Id.

### III.      *Corroboration*

When Commerce "relies on secondary information rather than on information obtained in the course of an investigation or review," it "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c); see also Deacero S.A.P.I. de C.V., 996 F.3d at 1288. "Independent sources may include, but are not limited to, published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review." 19 C.F.R. § 351.308(d). To "[c]orroborate" information, "[Commerce] will examine whether the secondary information to be used has probative value," id., meaning the information is both reliable and relevant, Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1354 (Fed. Cir. 2015).

## FACTUAL BACKGROUND

On November 6, 2023, Commerce initiated an antidumping duty investigation of truck and bus tires from Thailand at the request of Petitioners and Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"). See Truck and Bus Tires from Thailand: Initiation of Less-Than-Fair-Value Investigation, 88 Fed. Reg. 77960 (Dep't Com. Nov. 14, 2023), P.R. 56. Commerce selected Bridgestone and Prinx Chengshan Tire (Thailand) Co., Ltd. ("Prinx") as mandatory respondents[3] in the investigation. Final Determination, 89 Fed. Reg. at 83637.

---

[3] In cases where "[i]t is not practicable to make individual weighted average dumping margin determinations"—like where there are a "large number of exporters or producers involved in the

Throughout the course of the investigation, Commerce issued an initial questionnaire and several supplemental questionnaires to Bridgestone. See generally Letter from K. Marksberry to Bridgestone Corporation, re: Request for Information (Dep't Com. Dec. 13, 2023), P.R. 75 ("Initial Questionnaire"); Letter from K. Marksberry to D. Cannistra, re: Section A Supplemental Questionnaire (Dep't Com. Feb. 1, 2024), P.R. 124, C.R. 176 ("Sec. A Supp'l Questionnaire"); Letter from K. Marksberry to D. Cannistra, re: Sections A and B Supplemental Questionnaire (Dep't Com. Mar. 21, 2024), P.R. 149, C.R. 329 ("Secs. A & B Supp'l Questionnaire"); Letter from K. Marksberry to D. Cannistra, re: Section C Supplemental Questionnaire, Case No. A-549-848, Bar Code: 4534532-01 (Dep't Com. Mar. 28, 2024) ("Sec. C Supp'l Questionnaire"); Letter from K. Marksberry to D. Cannistra, re: 2nd Supplemental Sections B and C Questionnaire (Dep't Com. May 13, 2024), P.R. 213, C.R. 443 ("Second Secs. B & C Supp'l Questionnaire"). Bridgestone timely responded to each of these questionnaires. See generally Letter from D. Cannistra to G. Raimondo, re: Bridgestone's Section A Response to the Initial Questionnaire (Jan. 8, 2024), P.R. 94, 95, 97, 99, C.R. 28, 29, 31, 37, 38, 40 ("Section A Resp."); Letter from D. Cannistra to G. Raimondo, re: Bridgestone's Sections B-D Response to the Initial Questionnaire, Case No. A-549-848, Barcode: 4500023-01 (Jan. 29, 2024) P.R. 116–18, 221, C.R. 87–89, 91, 145 ("Secs. B–D Resp."); Letter from D. Cannistra to G. Raimondo, re: Bridgestone's Response to the Section A Supplemental Questionnaire (Feb. 20, 2024), P.R. 139, C.R. 224 ("Sec. A Supp'l Resp."); Letter from D. Cannistra to G. Raimondo, re: Bridgestone's Response to the Sections A-B Supplemental Questionnaire, Case No. A-549-848, Bar Code: 4544099-01 (Apr. 15, 2024) ("Secs. A & B Supp'l

---

investigation or review"—Commerce "may determine the weighted average dumping margins for a reasonable number of exporters or producers." Id. § 1677f-1(c)(2). Commerce may thus limit its examination to "a sample of exporters, producers, or types of products," or to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." Id. The respondents Commerce includes in this "reasonable number" of exporters are the mandatory respondents for the investigation or review. Id.

Resp."); Letter from D. Cannistra to G. Raimondo, re: Bridgestone's Response to the Section C Supplemental Questionnaire (Apr. 22, 2024), P.R. 188, C.R. 387–93, 395, 400, 407 ("Sec. C Supp'l Resp."); Letter from D. Cannistra to G. Raimondo, re: Bridgestone's Response to the 2nd Supplemental Sections B and C Questionnaire (May 22, 2024), P.R. 235–36, C.R. 474, 478 ("Second Secs. B & C Supp'l Resp.").[4]

### I.  Preliminary Determination

Commerce published its Preliminary Determination on May 20, 2024, calculating a dumping margin of 2.35 percent for Bridgestone. Truck and Bus Tires from Thailand: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination, 89 Fed. Reg. 43806, 43806–07 (Dep't Com. May 20, 2024), P.R. 233 ("Preliminary Determination"); Mem. from J. Maeder to R. Majerus, re: Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand (Dep't Com. May 14, 2024), P.R. 218 ("Prelim. IDM"). In calculating Bridgestone's margin, Commerce noted that "Bridgestone reported certain sales within its U.S. sales database to a U.S. purchaser that may have included sales to certain locations currently affiliated with Bridgestone rather than the first unaffiliated purchaser." Prelim. IDM at 9. For the purposes of the preliminary results, Commerce excluded those sales from its calculations and indicated that it "intend[ed] to collect additional information regarding these sales for consideration in the final determination." Id. Commerce also noted that it did not preliminarily make an adjustment to normal value for Bridgestone's claimed rebates in its home market database "because it did not separately identify each rebate and discount included in that field, as requested by Commerce." Id. at 15.

---

[4] These citations include only the questionnaires and responses that are relevant here.

## II.      *Verification*

In June and July of 2024, Commerce conducted several verifications of the information submitted by Bridgestone including, as relevant here, a verification of Bridgestone's sales data. See Mem from F. Montgomery to The File, re: Verification of the Sales Response of Bridgestone Corporation in the Antidumping Duty Investigation of Truck and Bus Tires from Thailand (Dep't Com. Aug. 22, 2024), P.R. 266, C.R. 558 ("Sales Verification Report"). Commerce identified four pieces of requested information that "Bridgestone failed to provide . . . prior to the end of verification": (1) "a reconciliation of the reported [other discounts in the U.S. market] to [Bridgestone's] accounting system"; (2) "a breakdown of the largest and smallest total values received by [Bridgestone's] customers for each type of rebate"; (3) "documentation regarding a large credit balance in [Bridgestone's] general ledger account . . . for volume bonus rebates for January–September 2023"; and (4) "a reconciliation of [Bridgestone's] sales made to [GCR Tires & Service ("GCR")] affiliate locations during the [period of investigation] to Bridgestone's U.S. sales database." Sales Verification Report at 2; see also IDM at 16–17.

## III.     *Final Results*

On October 17, 2024, Commerce issued its final determination, applying total adverse facts available to calculate a dumping margin for Bridgestone. Final Determination, 89 Fed. Reg. at 83636; Mem. from S. Fullerton to K. Marksberry, re: Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Truck and Bus Tires from Thailand at 2 (Dep't Com. Oct. 9, 2024), P.R. 290 ("IDM").

For each missing piece of information that Commerce identified during verification, "[Commerce found] that requested information is missing from the record and that Bridgestone did not comply with Commerce's requests to the best of its ability . . . ." IDM at 16–17. In addition, Commerce "identified widespread inaccuracies in the reported data . . . including

significant, unresolved errors with respect to Bridgestone's reporting of U.S. market rebate expenses, U.S. market destination, and certain missing or unverifiable sales expenses." Id. at 7–8. Applying total facts available with an adverse inference, Commerce assigned Bridgestone a dumping margin of 48.39 percent, the highest dumping margin alleged in USW's petition. Final Determination, 89 Fed. Reg. at 83637; IDM at 8–9. Commerce "corroborated the [48.39 percent rate] by comparing it to the individually calculated margins for Prinx . . . and found the [48.39 percent rate] to be within range of the highest individually calculated margins for Prinx." IDM at 10.

## PROCEDURAL HISTORY

On December 23, 2024, Bridgestone timely filed a complaint challenging Commerce's Final Determination.[5] See Compl. ¶ 1. On February 25, 2025, Bridgestone filed a motion to complete the record in this case to include three documents that Commerce rejected during verification: (1) a list of account balances that Bridgestone reported it maintained during the period of investigation with certain locations of GCR (the "Accounts Receivable Report"); (2) a report relating to rebates that Bridgestone gave to customers in the U.S. market during the period of investigation ("Rebate Report"); and (3) a "pivot table"[6] summary that purportedly sorts the

---

[5] USW separately challenged the Final Determination as it pertains to Prinx, another respondent in Commerce's antidumping investigation into imports of truck and bus tires from Thailand. See Compl., United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. United States, Ct. No. 25-0004 (USCIT filed Feb. 7, 2025), Feb. 7, 2025, ECF No. 10. The Government, with the consent of USW, sought to consolidate that action with this one, see Mot. to Consolidate, Mar. 4, 2025, ECF No. 35, and Bridgestone opposed consolidation, see Pl.'s Resp. in Opp'n to Mot. to Consolidate, Mar. 25, 2025, ECF No. 38. The court denied the motion to consolidate. See Bridgestone Ams. Tire Operations, LLC v. United States, 49 CIT __, __, 790 F. Supp. 3d 1369, 1380–81 (July 3, 2025). The court subsequently denied USW's motion for judgment on the agency record in United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. United States, 50 CIT __, __, 2026 WL 2031835 (July 1, 2026).

[6] "A pivot table is a type of data-summarization table that a user can . . . generate, based on a

information relating to Bridgestone's U.S. rebates by customer and rebate type ("Rebate Pivot Table"). See Pl.'s Amended Mot. to Complete or Supplement the Record, Feb. 25, 2025, ECF No. 33, Ex. 2, Attach. 1–3 ("Mot. to Complete"). On July 3, 2025, the court granted Bridgestone's motion to add the Accounts Receivable Report, Rebate Report, and Rebate Pivot Table to the judicial record, noting that it did not "pass on the ultimate issue of whether Commerce's underlying rejections were lawful." Bridgestone Americas Tire Operations, LLC v. United States, 49 CIT __, __, 790 F. Supp. 3d 1369, 1372, 1380 (2025).

On September 5, 2025, Bridgestone filed a motion for judgment on the agency record. Pl.'s Mot. for J. on the Agency R., Sep. 5, 2025, ECF No. 63 ("Pl.'s Br."). The Government and Defendant-Intervenor USW filed their respective responses on January 16, 2026. Gov't Resp. to Pl.' Mot. for J. on the Agency R., Jan. 16, 2026, ECF No. 71 ("Gov't Br."); Def.-Inter.'s Resp. to Pl.' Mot. for J. on the Agency R., Jan. 16, 2026, ECF No. 73 ("Def.-Inter.'s Br."). On February 27, 2026, Bridgestone filed its reply. See Pl.'s Reply in Supp. of Pl.'s Mot. for J. on Agency R., Feb. 27, 2026, ECF No. 77 ("Pl.'s Reply").

With all papers filed, the court held oral argument on April 9, 2026. See Order, Mar. 11, 2026, ECF No. 81. Prior to oral argument, the court issued, and the parties responded to, questions regarding the case. See Letter re: Qs. for Oral Arg., Mar. 19, 2026, ECF No. 85; Pl.'s Resp. to Qs. for Oral Arg., Apr. 2, 2026, ECF No. 94 ("Pl.'s OAQ Resp."); Def.'s Resp. to Court's Qs. for Oral Arg. Qs. for All Parties, Apr. 2, 2026, ECF No. 93 ("Gov't OAQ Resp."); Def.-Inter.'s Answers to Court's Qs. in Advance of Oral Arg., Apr. 2, 2026, ECF No. 91 ("Def.-Inter.'s OAQ Resp."). As directed by the court, the parties filed supplemental briefs following oral argument. See Pl.'s Post-Arg. Submission, Apr. 20, 2026, ECF No. 101; Def.'s Post-Arg. Submission, Apr. 20, 2026,

preexisting table of raw data." Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1340 (Fed. Cir. 2016).

ECF No. 100; Def.-Inter.'s Post-Arg. Submission, Apr. 20, 2026, ECF No. 99.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii).  Under 19 U.S.C. § 1516a, "the court shall hold unlawful any [Commerce] determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). A determination is supported by substantial evidence "if a reasonable mind might accept the evidence to support the finding."  PrimeSource Bldg. Prods., Inc. v. United States, 111 F.4th 1320, 1328 (Fed. Cir. 2024) (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Commerce's finding may . . . be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence."  SolarWorld Americas, Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (internal quotation marks and citation omitted).  Commerce's determinations, findings, and conclusions to be reviewed under this standard include those made during corroboration.  Deacero S.A.P.I. de C.V., 996 F.3d at 1299–1300.

The court "review[s] verification procedures employed by Commerce in an investigation for abuse of discretion," Micron Tech., Inc. v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997)); see also Pt. Asia Pac. Fibers TBK v. United States, 47 CIT __, __, 673 F. Supp. 3d 1320, 1327 (2023), including rejection of documents proffered during verification, see Heveafil Sdn. Bhd. v. United States, 58 F. App'x 843, 847 (Fed. Cir. 2003).  "The applicable Commerce Department regulations do not specify any standards or procedures for verification, and the courts have accorded Commerce broad discretion with regard to the conduct and extent of such investigations." Heveafil, 58 F. App'x at 847; see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co., 5 F.4th 1367, 1374 (Fed. Cir. 2021) (noting that the courts "afford tremendous deference to Commerce's administration of" antidumping laws) (internal quotation marks and

citations omitted); Içdaş Celik Enerji Tersane v. United States, 45 CIT __, __, 498 F. Supp. 3d 1345, 1361 (2021) ("Commerce retains broad discretion when deciding whether to accept a respondent's corrective information.").

**DISCUSSION**

Bridgestone challenges Commerce's Final Determination, arguing that (1) Commerce's application of total adverse facts available is unsupported by substantial evidence and not in accordance with the law and (2) Commerce did not meet its requirements under 19 U.S.C. § 1677e(c) to corroborate the dumping margin it assigned to Bridgestone. For the reasons set forth below, the court denies Bridgestone's motion for judgment on the agency record and sustains Commerce's Final Determination.

### I.     Commerce's Application of Total Adverse Facts Available Is Supported by Substantial Evidence and in Accordance with Law

During the investigation, Commerce determined that "necessary information is missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified." IDM at 7. Specifically, Commerce found that "certain sales information provided by Bridgestone was reported in a form and manner so inaccurate that Commerce was unable to either rely on the information as reported or successfully verify it." Id. Additionally, Commerce found that it lacked "sufficient sales expense data to calculate a dumping margin with reliable accuracy and without undue difficulty." Id. As a result, Commerce stated that it was "unable to calculate an accurate dumping margin using Bridgestone's reported data." Id. Commerce also determined that "Bridgestone has not acted to the best of its ability," given its identification of "widespread inaccuracies in the reported data at verification." Id.

As described above, Commerce may apply facts available when necessary information is

missing from the record, when a party withholds information requested by Commerce, fails to provide information in the form and manner requested, or provides information that cannot be verified. 19 U.S.C. § 1677e(a). Recall also that Commerce may use an adverse inference when selecting among the facts otherwise available if the party fails to cooperate to the best of its ability, Nippon Steel Corp., 337 F.3d at 1382. Commerce applies total adverse facts available "when none of the reported data is reliable or usable because, for example, the data contains pervasive and persistent deficiencies that cut across the entire record." Mukand, 767 F.3d at 1305.

Commerce's determination that Bridgestone's data was unreliable and unverifiable and that Bridgestone did not cooperate to the best of its ability is supported by substantial evidence considering the numerous errors and missing information Commerce identified. Commerce identified errors with Bridgestone's data that fall into several categories: (1) information about affiliation with GCR, (2) information about rebate programs, (3) information about discounts, (4) information about the destination of U.S. sales, and (5) information about expenses incident to bringing the merchandise to the place of delivery. See generally IDM at 16–34. Before verification began, Commerce had already issued several supplemental questionnaires regarding many of these errors. Once at the verification stage, Commerce discovered numerous additional errors including missing information, incorrect information, and information not provided in the form or manner requested. The court need not consider whether any individual error in Bridgestone's reporting could independently support Commerce's application of total adverse facts available. Instead, a finding that "the data contains pervasive and persistent deficiencies that cut across the entire record" supports a determination by Commerce to apply total adverse facts available. Mukand, 767 F.3d at 1305. In light of the numerous errors discovered during the investigation, Commerce reasonably concluded that necessary information was missing from the record, that Bridgestone

did not act to the best of its ability, and that the errors cut across the entire record.  Commerce's

determination to apply total adverse facts available is, as a result, supported by substantial evidence

and in accordance with law.  Bridgestone's arguments to the contrary are unpersuasive.

### A.      Bridgestone's Overarching Arguments Are Unpersuasive

Before summarizing the individual categories of errors and responding to Bridgestone's

arguments specific to each one, the court considers Bridgestone's more overarching arguments that

apply to all or multiple of the categories of errors that Commerce identified.  Bridgestone argues

throughout that (1) Commerce verified the relevant information, that (2) information requested by

Commerce was not relevant, that (3) Commerce should have accepted or made "minor corrections"

to Bridgestone's data, and that (4) Commerce should have looked elsewhere in the record for the

relevant information or provided additional supplemental questionnaires.  The court considers each

of these more overarching arguments in turn.

### 1.      Bridgestone's Argument that Commerce Verified its Information Is Inaccurate

First, Bridgestone suggests that much of the information Commerce found to be incomplete

or inaccurate was verified by Commerce.  For example, Bridgestone argues that "Commerce

verified total quantity and total value of U.S. sales and completed numerous verification

procedures without discrepancy."  Pl.'s Reply at 20.  According to Bridgestone, "Commerce

possessed and examined the U.S. sales database, store-level identifiers, rebate totals, expense data,

and supporting accounting documentation."  Id. (citing Sales Verification Report at 2, 17–15, 34).

However, Commerce's Sales Verification Report indicates otherwise.  See Sales Verification

Report at 2–3.  Commerce was unable to verify much of Bridgestone's data because

(1) "[Bridgestone] did not provide . . . information prior to the conclusion of verification

proceedings," (2) "[c]ompany officials were unable to provide a complete reconciliation [of sales

made to GCR affiliate locations] prior to the completion of verification, (3) "Bridgestone did not accurately report its U.S. market rebate expenses," and more. Id.

### 2. Bridgestone's Argument that Information Requested by Commerce Was Irrelevant Is Unavailing

Bridgestone also argues that information requested by Commerce was irrelevant to the calculation of the dumping margin. This argument is unavailing because it is for Commerce, not the respondent, to decide whether information is relevant to Commerce's determination. Under 19 U.S.C. § 1677e(a), Commerce "shall . . . use the facts otherwise available," where a party "withholds information that has been requested by [Commerce]." 19 U.S.C. § 1677e(a). This mandate does not include an exception where a party deems information requested by Commerce to be irrelevant. It is Commerce's task to request information it determines may be relevant, and a respondent's role to "comply with such requests for information, regardless of the respondent's perception or substituted judgment." SeAH Steel Corp. v. United States, 47 CIT __, __, 659 F. Supp. 3d 1318, 1326 (2023). Additionally, without the ability to verify information, Commerce was, in many instances, unable to determine whether information was relevant or not. For example, Bridgestone argued before Commerce that a large credit balance in its general ledger account did not "represent a large balance considered in the context of the whole." Letter from D. Cannistra to G. Raimondo, re: Resubmission of Bridgestone's Rebuttal Brief at 21, Case No. A-549-848, Bar Code: 4636442-01 (Sep. 24, 2024). However, without any information on that large credit balance, Commerce could not ascertain whether it was relevant to the calculation of price adjustments or not. See IDM at 22.

### 3. Bridgestone's Argument that its Errors Could be Rectified Using Minor Corrections Is Unavailing

Bridgestone further avers that certain errors could be rectified using "minor corrections." Pl.'s Br. at 21–22. However, Commerce reasonably determined that the changes Bridgestone

requested were not minor in nature. See, e.g., IDM at 24–25. As Commerce noted in its verification agenda, "[n]ew information [is] accepted at verification only" in certain circumstances including when "the information makes minor corrections to information already on the record." See Letter from K. Marksberry to D. Cannistra, re: Verification of Questionnaire Responses at 2 (Dep't Com. June 3, 2024), P.R. 241, C.R. 482 ("Verification Agenda"). Verification is not an opportunity to submit new factual information or corrections deemed not to be minor nor an opportunity to "fill . . . gap[s] caused by [a party's] failure to provide a questionnaire response or evidence requested during verification." Fischer S.A. Comercio v. United States, 34 CIT 334, 349, 700 F. Supp. 2d 1364, 1377 (2010); see also Goodluck India, 11 F.4th at 1343–55; SeAH Steel Corp., 659 F. Supp. 3d at 1324. Bridgestone's attempts to submit corrections during verification did not constitute minor corrections but instead involved significant errors that were systemic in nature. See IDM at 25–27. For example, Commerce's determination not to accept Bridgestone's "minor correction" related to its rebate reporting is supported by substantial evidence and in accordance with law because "a failure to properly report three expense fields [is] an error that affects every reported U.S. sale." See IDM at 25. Commerce noted that Bridgestone's "rebates are . . . granted to specific customers and the price of the same merchandise between customers could potentially vary greatly depending on the rebates for which a customer qualifies." IDM at 26. Additionally, as the Government explains, making Bridgestone's requested "minor correction" to the rebate reporting that Bridgestone requested would have required Commerce to create new database fields, allow resubmission, or completely correct or replace an existing data field. Gov't OAQ Resp. at 5.

Though some of the corrections Bridgestone suggested could reasonably be considered "minor" when contemplated in isolation, see, e.g., Pl.'s Br. at 27 (describing "incorrect cell

references in Excel formulas or calculation mistakes due to misaligned numbers"), such a task can constitute "undue difficult[y]," 19 U.S.C. § 1677m(e), where, as here, there are "widespread inaccuracies in the reported data," IDM at 7. Commerce is not required to consider information that cannot "be used without undue difficulties." Id. § 1677m(e).

> **4.      Bridgestone's Argument that Commerce Should Have Found the Data Elsewhere or Issued Additional Questionnaires Is Unavailing**

Finally, Bridgestone argues that Commerce should have looked elsewhere in Bridgestone's submissions to find requested information or that Commerce should have issued additional questionnaires. See Pl.'s Br. at 27–28. "[T]he burden of creating an adequate record lies with interested parties and not with Commerce." Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016). This is reflected in the requirement that an interested party must cooperate "to the best of its ability" with Commerce's requests for information. 19 U.S.C. § 1677e(b). Where Bridgestone failed to provide requested information and provided inaccurate or incomplete information, it cannot be said that it acted to the best of its ability. In such a circumstance, Commerce was not required to sift through the record to remedy Bridgestone's errors nor issue additional supplemental questionnaires in addition to those it had already issued.

To the extent that Bridgestone suggests that Commerce failed to sufficiently inform Bridgestone of any particular deficiency and provide it with an opportunity to remedy it in accordance with 19 U.S.C. § 1677m(d), that argument is unpersuasive. Commerce issued numerous supplemental questionnaires, see generally Sec. A Supp'l Questionnaire; Secs. A & B Supp'l Questionnaire; Sec. C Supp'l Questionnaire; Second Secs. B & C Supp'l Questionnaire; Commerce identified issues in Bridgestone's reporting in its preliminary determination, see generally Prelim. Determination; Prelim. IDM; and continued to provide Bridgestone with opportunities to remedy its errors during verification, see generally Sales Verification Report.

Where Commerce identified errors for the first time during verification, it was not obligated to issue further notice or opportunity to remedy. As the Government notes, verification "does not entail a request for information," and "is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information." Hung Vuong Corp. v. United States, 44 CIT __, __, 483 F. Supp. 3d 1321, 1349 (2020); see also Goodluck India, 11 F.4th at 1343 ("Verification represents a point of no return."); Dalian Meisen Woodworking Co v. United States, 47 CIT __, __, 2023 WL 3058783, at *4 (Apr. 24, 2023) ("[I]f [Commerce] need not accept corrective substantive information at verification as to deficiencies in a respondent's original submissions, it need not seek corrective substantive information when verification responses are deficient." (emphasis in original)).

### B. Bridgestone's Arguments Specific to Individual Categories of Errors Are Unpersuasive

Having rejected Bridgestone's more overarching arguments, the court now turns to each of the categories of errors that Commerce identified in turn and responds to Bridgestone's arguments regarding each one. Recall that Commerce identified errors in five categories of Bridgestone's information: (1) information about affiliation with GCR, (2) information about rebate programs, (3) information about discounts, (4) information about the destination of U.S. sales, and (5) information about expenses incident to bringing the merchandise to the place of delivery. See generally IDM at 16–34. For the reasons set forth below, the court does not find any of Bridgestone's arguments regarding any individual category of errors to be independently persuasive.

#### 1. Affiliation

Under 19 U.S.C. § 1677a(b), " 'constructed export price' means the price at which the

subject merchandise is first sold . . . in the United States . . . to a purchaser not affiliated with the producer or exporter." Because Commerce must determine the price at which the merchandise was first sold to an unaffiliated customer to calculate the constructed export price, information about affiliation is essential to Commerce's calculation of a final dumping margin. Commerce here determined that Bridgestone's reported U.S. sales data was not complete or verifiable because it was unable to verify Bridgestone's identification of sales to the first unaffiliated customer. IDM at 17.

At the outset of the investigation, Commerce asked Bridgestone for information regarding affiliation, informing Bridgestone that—if it "sold to an affiliate that resold the merchandise to an unaffiliated party"—Bridgestone should "report the affiliate's resales during the [period of investigation] to [the] unaffiliated customer rather than your sales to the affiliate." Initial Questionnaire at B-4. Commerce warned Bridgestone that it might apply adverse facts available if Bridgestone "d[id] not provide the affiliate's sales to the first unaffiliated party." Id. at B-5. Bridgestone reported that it made sales to affiliated GCR Tires & Service ("GCR") retail locations but did not identify any sales to affiliates within its U.S. sales database. See generally Sec. A Resp.; see also Secs. B–D Resp.

Commerce attempted to clarify Bridgestone's reporting on GCR sales in a supplemental questionnaire. See Sec. A Supp'l Questionnaire ¶ 19. Specifically, Commerce asked "whether [Bridgestone] treated U.S. sales to GCR as affiliated sales, unaffiliated sales, or a mix depending on the GCR location." Id. Bridgestone responded that it "treated sales to all GCR locations as affiliated sales." Sec. A Supp'l Resp. at 11.

Unable to identify which sales to GCR stores were made to affiliated or unaffiliated entities, Commerce excluded all sales made under GCR's customer code for the preliminary determination

and explicitly stated that it intended to collect further information about these sales for the final determination.  See Prelim. IDM at 9.

Commerce issued a second supplemental questionnaire requesting that Bridgestone "revise [its] U.S. sales database so that all reported sales are sales to the first unaffiliated customer in the U.S."  Second Secs. B & C Supp'l Questionnaire at 5 (emphasis in original).  Commerce also asked Bridgestone to "provide a list of the customer codes used by Bridgestone for GCR and indicate which locations were affiliated or unaffiliated during the [period of review]."  Id.  In response, Bridgestone stated that it "reported all downstream sales of the affiliated GCR stores" in a separate database and "estimated [the] quantities of Thai-origin tires" based on the percentage "of the truck and bus tires sold to GCR stores" that were "of Thai-origin."  Second Secs. B & C Supp'l Resp. at 2.

At verification, Commerce attempted to confirm whether it could correctly identify sales to certain GCR locations within Bridgestone's sales database using ship-to-location codes.  IDM at 18.  However, Commerce noted that "[Bridgestone's] company code list did not contain every affiliated GCR location in question," and "requested that [Bridgestone] provide a reconciliation of its accounts receivable for sales made to affiliated GCR locations."  Sales Verification Report at 2.  Commerce reported that Bridgestone "officials were unable to provide a complete reconciliation prior to the completion of verification."  Id.  Because "the reconciliation did not include sales to all of the . . . requested affiliated GCR customers," Commerce was "unable to identify the . . . sales in Bridgestone's U.S. sales database that were made to its affiliate GCR locations, or reconcile these sales to [Bridgestone's] accounting system during the verification."  Id. at 17.  As a result, Commerce could not "examine if information regarding price to an unaffiliated customer was available for reporting purposes," Sales Verification Report at 17, and could not verify

Bridgestone's identification of sales to affiliated GCR locations [nor] the reasonableness of its proposed allocation methodology of sales from GCR to the first unaffiliated customer. IDM at 18; see also Sales Verification Report at 17.

Bridgestone makes several arguments related to Commerce's determination regarding affiliation. Though the court sustains Commerce's determination to apply total adverse facts available based on the pervasiveness of errors across all of Bridgestone's data, the court briefly deals with each of Bridgestone's individual arguments regarding its affiliation with GCR below to conclude that Commerce's determinations regarding affiliation are independently supported by substantial evidence and in accordance with law.

First, Bridgestone avers that its Accounts Receivable Report was reconciled in precisely the way Commerce requested. See Pl.'s Br. at 12–13. Bridgestone argues that Commerce's verifiers did not request a "reconciliation," but instead asked for the accounts receivable report for the eleven stores operated by GCR during the period of investigation. Id. at 13. The Government counters that "Commerce did request a reconciliation of Bridgestone's accounts receivable records at verification." Gov't Br. at 16 (citing Sales Verification Report at 17). Regardless of the wording of Commerce's request, Bridgestone knew from the initial and supplemental questionnaires that Commerce sought information related to Bridgestone's affiliation with GCR locations. Initial Questionnaire at B-4 (asking about affiliates and related sales); Sec. A Supp'l Questionnaire ¶ 19 (asking about Bridgestone's affiliation with GCR stores); Second Sec. B & C Supp'l Questionnaire at 5 (asking for a revised sales database with sales to the first unaffiliated customer and a list of customer codes for all GCR locations). Commerce also explicitly indicated in its Preliminary Determination that it was unable to identify which sales to GCR stores were made to affiliated or unaffiliated entities and that it "intend[ed] to collect additional information regarding these sales

for consideration in the final determination." Prelim. IDM at 9. Even if Commerce did not explicitly request a "reconciliation" at verification, Bridgestone knew that Commerce sought to identify which GCR stores were affiliated or unaffiliated and verify whether Bridgestone's downstream sales data was accurate for the purpose of calculating a constructed export price.

Relatedly, Bridgestone suggests that accounts receivables reports "do not, as a matter of general practice, include every possible location associated with a customer, particularly where those locations have no unpaid balances." Pl.'s Br. at 14. According to Bridgestone, the reports at issue were complete because they included the customer codes associated with the stores with unpaid balances. See Pl.'s Br. at 15. The Government counters that "Bridgestone cites no support for [its] proposition" that accounts receivables reports do not contain every location. Gov't Br. at 16. Defendant-Intervenor USW separately argues that the record belies Bridgestone's claims that the reports exclude stores where no sales were made and that the reports only include stores with unpaid balances. Def.-Inter.'s Br. at 26.

Even if Bridgestone's claims are accurate regarding accounts receivables reports generally and the completeness of the information in the Accounts Receivable Report here, Bridgestone had an opportunity to make these arguments to Commerce during verification and failed to do so. As a result, Commerce's determination that necessary information was missing from the record is supported by substantial evidence. Commerce stated in its Verification Agenda that "the verifiers will need to speak to appropriate personnel concerning your client's questionnaire responses and other information submitted on the record of the proceeding." Verification Agenda at 2. Commerce further indicated that, "[i]f your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on," and that "[i]f, due to time constraints, it is not possible to return to that item, we may consider the item unverified, which may result in our

basing the final determination of this investigation on [facts otherwise available], possible including [adverse facts available]." Id. (emphasis omitted). Commerce attempted to "locate the appropriate personnel able to amend the exhibit or answer Commerce's questions prior to the conclusion of Bridgestone's [constructed export price] sales verification." IDM at 20; see also Sales Verification Report at 2, 17. Bridgestone's arguments that it "made personnel available throughout verification," Pl.'s OAQ Resp. at 10, and that "Commerce did not pursue such clarification," id. at 11, are belied by its admission that when "Commerce asked to speak with the person who prepared the [accounts receivables] reports . . . the person was unavailable at that precise moment," Pl.'s Br. at 18. As the Government notes, if the appropriate personnel had been available during verification, any additional information or clarification they provided may have revealed other problems or questions. It is ultimately not the contents of the accounts receivable reports that support Commerce's determination that necessary information was missing from the record, but Bridgestone's continued failure to provide requested information about its affiliation and unaffiliated sales throughout the investigation, culminating in the absence of the person who prepared the reports at issue during verification.[7]

---

[7] Bridgestone relatedly argues that Commerce improperly refused to place the Accounts Receivable Report on the record. See Pl.'s Br. at 39. Commerce declined to accept the Accounts Receivable Report at verification because it found the Report to be incomplete and was unable to contact the personnel who had created it. See Sales Verification Report at 17. Recall that "Commerce retains broad discretion when deciding whether to accept a respondent's corrective information," and that "[t]he court may only intervene if Commerce's rejection of supplemental information constitutes an arbitrary abuse of its discretion." Içdaş Celik Enerji Tersane v. United States, 45 CIT __, __ 498 F. Supp. 3d 1345, 1361 (2021). Regardless, because the court finds that Commerce's determination that "widespread inaccuracies in the reported data" made Bridgestone's data "so inaccurate that Commerce was unable to either rely on the information as reported or successfully verify it," IDM at 7, is supported by substantial evidence and in accordance with law, the court does not consider whether Commerce abused its discretion in refusing to place particular information on the record. Instead, the court notes that Commerce's determination to apply total adverse facts available would be supported by substantial evidence and in accordance with law even if the Accounts Receivables Report was part of the record.

## 2.   *Rebate Programs*

Recall that under 19 C.F.R. § 351.401(c), Commerce adjusts the constructed export price for rebates to more accurately estimate the price at which merchandise is sold in the United States. See also id. § 351.102(38).   Rebate programs are a particularly important adjustment in Commerce's calculation of an accurate constructed export price estimating the U.S. sales price where—as in the tire industry—they play a significant part of the sales process.  See IDM at 22. Here, Commerce determined that Bridgestone (1) misreported information for three rebate programs in its U.S. sales database, failed to provide a breakdown of the smallest and largest values received by its customers, failed to provide documentation regarding a large credit balance for volume bonus rebates, and made a number of other pervasive errors across its rebate reporting. See IDM at 21–22, 24.  As a result, Commerce found that crucial information "is missing from the record," that "Bridgestone failed to comply with Commerce's request for information," and that Bridgestone "did not cooperate to the best of its ability."  Id. at 22.

In its Initial Questionnaire, Commerce requested that Bridgestone "[r]eport the unit value of each rebate given to the customer" and "[c]reate a separate field for reporting each rebate granted" noting that "[r]ebates should be reported with the sales to which they apply."  Initial Questionnaire at C-24.  In response, Bridgestone reported three rebate programs, labeling them REBAT1U, REBAT2U, and REBAT3U in its U.S. sales database.  See Secs. B–D Resp. at C-28–C-29.   Commerce issued a supplemental questionnaire asking for more information, including "which rebate program corresponds to which rebate field" and how the rebates "correspond to the rebate fields" in the sales database.  Sec. C Supp'l Questionnaire at 9. Bridgestone indicated which field corresponded to each rebate program and indicated that "[t]he rebates . . . were allocated over sales to the customer receiving the rebate."  Sec. C. Supp'l Resp. at 17.  Commerce found this insufficient, stating that Bridgestone "failed to explain how the

calculation for each program was reported in its U.S. sales database." IDM at 24.

To verify Bridgestone's rebate reporting, Commerce asked Bridgestone to provide a breakdown of the largest and smallest total values received by Bridgestone's customers for each type of rebate. See Sales Verification Report at 2, 24–25; IDM at 21. Bridgestone's officials were unable to provide this information prior to the conclusion of verification. See Sales Verification Report at 25.

Bridgestone argues that it provided a Rebate Report that identifies the customer codes corresponding to the smallest and largest rebates. Pl.'s Reply at 13. However, as the Government notes, the Rebate Report would have required "organization and sorting by . . . customer codes and classification of rebates," IDM at 21; see also Gov't OAQ Resp. at 6. 19 U.S.C. § 1677e states that Commerce "shall" use facts otherwise available if "an interested party . . . fails to provide such information . . . in the form and manner requested." 19 U.S.C. § 1677e(a)(2)(B). As described in response to Bridgestone's "minor corrections" arguments, supra Sec. I, Commerce is not required to consider information where it cannot "be used without undue difficulties." Id. § 1677m(e). While it may seem simple for Commerce to sort or organize a spreadsheet, where Commerce is faced with the "widespread inaccuracies in the reported data," IDM at 7, requiring such steps constitutes "undue difficult[y]." 19 U.S.C. § 1677m(e)(5); see also Mukand, 767 F.3d at 1305.[8]

---

[8] Bridgestone separately suggests that Commerce improperly refused to place the Rebate Report and Rebate Pivot Table on the record. See Pl.'s Br. at 38. The Rebate Report that Bridgestone provided, by Commerce's description, constituted a "list of total rebates by month and customer of the [period of investigation]" that "is a report generated from [Bridgestone]'s rebate tracking system that contains a list of rebate agreements, and the settled amount for each month of the [period of investigation]." IDM at 21. Commerce explained that this submission was unacceptable because it "required organization and sorting by customer and rebate type to provide the information requested, collating the values using other data such as Bridgestone's customer codes and classification of rebates." Id. As a result, the record that Commerce compiled "only contains a sample selection of the report from the rebate tracking system." Id. Just as with the Accounts Receivable Report, supra n.6, because the court finds that Commerce's determination that "widespread inaccuracies in the reported data" made Bridgestone's data "so inaccurate that

Commerce also requested documentation regarding a large credit balance for volume bonus rebates. See Sales Verification Report at 2–3, 25–26, IDM at 21. Bridgestone suggests that the relevant account was used exclusively for rebates to affiliated GCR locations such that it was irrelevant. Pl.'s Br. at 22. However, without any additional information about the credit balance, along with misreporting more widely across the rebate data Bridgestone provided, Commerce could not determine whether this credit balance was relevant to its calculation of U.S. sales price. This argument is addressed in more detail supra Sec. I.

Commerce uncovered additional problems with Bridgestone's rebate reporting during verification. See Sales Verification Report at 24–26. First, Commerce discovered that the "per-unit expenses for the annual volume, smart resource, and exceptional growth rebates were not reported in the U.S. sales database." Id. at 24. Commerce also found that the three reported rebate fields and expense calculations contained a fourth, previously undisclosed rebate program. Id. at 24–26. Commerce discovered that the fourth rebate program was reported doubly in the three rebate fields and was included in Bridgestone's calculation of U.S. indirect selling expenses. Id. at 25–26. Commerce discovered a number of other errors with Bridgestone's rebate reporting during verification, including that Bridgestone's separate system for tracking rebates and its ledger accounts containing rebates did not reconcile, that Bridgestone provided additional undisclosed rebates to U.S. customers from undisclosed rebate programs, and that at least one of the accounts contained additional accounting items. Id. Bridgestone attempted to report these errors as a minor correction, which Commerce declined, finding the "total misreporting of three sales expense

_____

Commerce was unable to either rely on the information as reported or successfully verify it," IDM at 7, is supported by substantial evidence and in accordance with law, the court does not consider whether Commerce abused its discretion in refusing to place particular information on the record. Instead, the court finds that Commerce's determination to apply total adverse facts available would be supported by substantial evidence and in accordance with law even if the Rebate Report and Rebate Pivot Table were part of the record.

fields"—"an error that affects every reported U.S. sale[—]to be both systemic in nature and missing information that should be on the record."  IDM at 25.

Bridgestone argues that it fully cooperated with Commerce's requests for rebate information because it "provided Commerce with full access to its rebate accounting system."  Pl.'s Br. at 19.  Even if Bridgestone provided Commerce with access to its full rebate accounting system, this would not comply with the requirement in 19 U.S.C. § 1677e that an interested party "provide such information . . . in the form and manner requested."  19 U.S.C. § 1677e(a)(2)(B).  Commerce asked Bridgestone on multiple occasions to report each rebate in a separate field, see Initial Questionnaire at C-24; Secs. B–D Resp. at C-28–C-29; Sec. C Supp'l Questionnaire at 9.  Even after issuing three questionnaires, Commerce found Bridgestone's response insufficient, finding that Bridgestone "failed to explain how the calculation for each program was reported in its U.S. sales database."  IDM at 24.  Recall again that "[t]he burden of creating an adequate record lies with interested parties and not with Commerce."  Nan Ya Plastics Corp., 810 F.3d at 1337.  Providing Commerce with "full access," Pl.'s Br. at 19, is not the equivalent to providing Commerce complete, accurate information in the "form and manner requested."  19 U.S.C. § 1677e(a)(2)(B).  Bridgestone failed to meet its burden of creating an adequate record.

### 3.    Discounts

Just as with rebates, Commerce adjusts its calculation of constructed export price and normal value to account for discounts to more accurately estimate the price at which merchandise is sold in the United States and in the home market.  See 19 C.F.R. §§ 351.401(c), 351.102(38).  Commerce discovered errors with Bridgestone's reporting of discounts both in the U.S. market and discounts in Bridgestone's home market.  The court addresses each of these errors in turn.

### i.    Discounts in the U.S. Market

Commerce determined that Bridgestone failed to provide documentation related to

discounts in the U.S. market constituting information missing from the record. During verification, Commerce reviewed the billing entries Bridgestone reported for one of its discount programs and determined that the reported expenses in field, labeled "OTHDISU," contained additional items beyond the expenses Bridgestone noted. See Sales Verification Report at 23. Commerce requested "an itemized reconciliation for the OTHDISU values reported in this schedule to [Bridgestone's] accounting system, but did not receive this reconciliation prior to the conclusion of verification." Id.

Bridgestone argues that "Commerce did not identify any unreported discount" and "[Commerce] objected only to the requested reconciliation format." Pl.'s Reply, Exhibit 1 at 1. But Commerce did not state that a discount went unreported or that the information was incorrectly formatted. Instead, Commerce found that "the credit and debit notes . . . reflected the total value of the credit and debit notes inclusive of other charges and reimbursements not related to the reported expense," and this "could potentially result in the underreporting of the reported value of the discount," meaning Commerce could not accurately determine the expense adjustment under 19 U.S.C. § 1677a(c). IDM at 23.

Bridgestone also argues that it provided the total values of the credit and debit notes used for calculating OTHDISU such that no information was missing from the record. Pl.'s Br. at 26. However, Commerce requested a detailed reconciliation to examine whether using the total values as an expense adjustment was appropriate. IDM at 23. As described above, the respondent's role is to "comply with [Commerce's] requests for information, regardless of the respondent's perception or substituted judgment." SeAH Steel Corp., 659 F. Supp. 3d at 1326. Even where a party believes requested information to be irrelevant, Commerce "shall . . . use facts otherwise available" where, as here, that party "withholds information that has been requested by

[Commerce]."  19 U.S.C. § 1677e(a)(2)(A).

### ii.        Discounts in Bridgestone's Home Market

Just as with U.S. discounts, Commerce found that Bridgestone misreported its home market discounts.  In its Initial Questionnaire, Commerce instructed Bridgestone to report other discounts given to its customers in its home market and to "[c]reate a separate field for reporting each discount granted."  Initial Questionnaire at B-25.  Commerce separately instructed Bridgestone to "[r]eport any price adjustments made for reasons other than discounts or rebates," in a separate field.  Id. at B-24.  Despite this, Bridgestone initially reported other discounts in the home market in the same field with other price adjustments despite Commerce's instructions.  See Secs. B–D Resp. at B-29; IDM at 31.  Commerce issued a supplemental questionnaire again asking Bridgestone to provide individual calculations for each type of discount.  See Secs. A & B Supp'l Questionnaire at 9 ("[P]lease revise Bridgestone's HM sales database to create a separate field for each type of billing adjustment.").  Despite this request, Bridgestone again reported a single rebate field.  See Secs. A & B Supp'l Resp. at SB-13–SB-14.  After being instructed for a third time to split the calculation of its reported expenses, see Second Secs. B & C Supp'l Questionnaire at 5, Bridgestone reported the cost-reduction expenses by one entity as "OTHDISH."  See Second Secs. B & C Supp'l Resp. at 4.  Even with the revised database, Commerce discovered at verification that Bridgestone reported the discount amount incorrectly for one of its customers.  See Sales Verification Report at 22.

Bridgestone does not directly address the errors with its home market discount reporting in its briefing.

### 4.        Destination of U.S. Sales

Recall that Commerce calculates a dumping margin by comparing the normal value to the export price or the constructed export price.  Commerce generally makes this calculation by

comparing weighted-average[9] normal values and export prices or constructed export prices, a method known as the "average-to-average method." 19 C.F.R. § 351.414(b)(1), (c)(1). However, where "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," Commerce may use an alternative method to calculate the dumping margin. 19 U.S.C. § 1677f-1(d)(1)(B). Commerce stated that it uses sales destination information to determine whether there is a pattern of export prices that differ significantly among regions to in turn determine which method is appropriate to calculate a dumping margin. See IDM at 29. Here, Commerce found that Bridgestone failed to provide accurate sales destinations, constituting missing necessary information. Id.

In its Initial Questionnaire, Commerce requested that Bridgestone report the "five-digit U.S. postal 'ZIP' code of the customer's place of delivery" for each of its U.S. sales. Initial Questionnaire at C-30. Bridgestone indicated that it provided the requested information. See Secs. B–D Resp. at C-39. During verification, Commerce discovered that Bridgestone had "reported the billing address of the purchasing company as the destination and state, rather than that of the delivery address contained in the invoice and delivery information." Sales Verification Report at 2, 20. This error applied to "all sales for the customers with multiple locations for which Commerce conducted sales traces." IDM at 28.

Bridgestone's only developed argument regarding the sales destination information is that the error does not matter because its sales did not pass the Cohen's d test. Pl.'s Br. at 31. As discussed above, supra Sec. I, this argument is unavailing because it is Commerce's task to request information it determines may be relevant, and a respondent's role to "comply with such requests

---

[9] "[A] weighted average is a mean where some values in the dataset contribute more than others." CME Acquisitions, LLC v. United States, 49 CIT __, __, 793 F. Supp. 3d 1375, 1384 n.2 (2025).

for information, regardless of the respondent's perception or substituted judgment." <u>SeAH Steel Corp.</u>, 659 F. Supp. 3d at 1326.

### 5. *Expenses Incident to Bringing Merchandise to the Place of Delivery*

Recall that Commerce adjusts export price and constructed export price by the amount attributable to the cost "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States," including warehousing, transportation, and packing expenses. 19 U.S.C. § 1677a(c)(2)(A). Commerce determined that Bridgestone failed to provide information on its warehousing expenses, <u>see</u> IDM at 29–30, incorrectly reported transportation expenses, see <u>id.</u> at 31, and incorrectly reported the cost of its packing materials, <u>see</u> <u>id.</u>, constituting necessary information for the calculation of constructed export price missing from the record. These determinations are supported by substantial evidence and in accordance with law.

### i. *Warehousing Expenses*

Regarding warehousing expenses, Commerce requested a list of overhead selling expenses incurred in the country of manufacture and descriptions thereof in its initial questionnaire. <u>See</u> Initial Questionnaire at C-36. In response, Bridgestone reported indirect selling expenses and a total value for selling expenses but did not provide the requested description of sales overhead expenses or a list of overhead expenses incurred. Secs. B–D Resp. at C-47. Commerce issued a supplemental questionnaire, requesting again that Bridgestone report all overhead expenses incurred. <u>See</u> Sec. C Supp'l Questionnaire at 14. Bridgestone responded, indicating that it had misreported its sales expenses by including expenses that should be allocated to other expense fields and calculated a new expense field accounting for the expenses, labeled "DWAREHU." <u>See</u> Sec. C Supp'l Resp. at 30. However, during verification Commerce found that "this field did not

appear in Bridgestone's U.S. sales database." Sales Verification Report at 3, 33–34. As a result, Commerce concluded that it had no warehousing expense to verify. See IDM at 30.

During verification, Commerce discovered additional errors with Bridgestone's reporting of both fields associated with warehouse expenses in the United States: one was calculated using an incorrect ratio and the other was calculated from an incorrect expense account unrelated to warehousing. Sales Verification Report at 3, 30–31; see also Sec. C Supp'l Resp. at 21. Bridgestone's only argument regarding its reporting of U.S. warehousing is that "[t]he referenced 'inaccuracies' were clerical errors in expense calculation worksheets, such as incorrect cell references in Excel formulas or calculation mistakes due to misaligned numbers." Pl.'s Br. at 28 (citing Sales Verification Report at 4, 34). As described above, supra Sec. I, corrections that may be minor in isolation can constitute "undue difficulty" when those errors are pervasive and widespread, as they were here. 19 U.S.C. § 1677m(e).

### ii.    Transportation Expenses

Regarding transportation expenses, Commerce asked Bridgestone in its initial questionnaire to report the unit costs of transportation including international freight, U.S. duties, and other U.S. movement expenses. See Initial Questionnaire at C-28, C-30. During verification, Commerce observed that the values Bridgestone reported for individual bills of lading for the calculation of these transportation expenses did not match the values in the calculation worksheet Bridgestone used to calculate the per-unit amount for those expenses. See Sales Verification Report at 2, 29–30. Additionally, Bridgestone failed to include an updated calculation for domestic inland freight incurred on U.S. sales specific to U.S. shipments as requested by Commerce. See Sec. C Supp'l Questionnaire at 10; Sec. C Supp'l Resp. at Exhibit C-22; Sales Verification Report at 3, 28–29. Bridgestone does not make any arguments specific to its reporting of transportation expenses.

### iii.     *Packing Expenses*

Regarding packing expenses, Commerce initially asked Bridgestone to include a list of packing materials, the average cost of each material, and how much material was used.  See Initial Questionnaire at B-35.  Bridgestone's response provided the names of the accounts and the account values for each home market company incurring packing expenses, but only identified the items included in the calculation of the expense for one entity.  Secs. B–D Resp. at Exhibit B-18.  Commerce issued a supplemental questionnaire, asking Bridgestone to "explain the specific packing materials used in the specific packing expenses incurred by [other entities]."  Secs. A & B Supp'l Questionnaire at 13.  In response, Bridgestone identified the packing materials used in subject merchandise.  See Secs. A & B Supp'l Resp. at SB-24.  However, at verification, Commerce discovered that Bridgestone failed to disclose that its reported packing materials expenses included expenses for materials used for non-subject merchandise.  See Sales Verification Report at 3, 34–35.  As a result, Commerce concluded that errors remain in the calculation of packing expenses.  See IDM at 33.

Bridgestone's only argument regarding packing materials expenses is that it "[s]uch a classification issue does not demonstrate that core sales or expense data were missing or unverifiable."  Pl.'s Reply at 18.  The court does not consider this statement, contained only in Bridgestone's Reply, to constitute an independent argument regarding the misreporting of packing expenses.  To the extent Bridgestone suggests the "classification issue" constitutes a "minor correction," that argument is addressed supra Sec. I.[10]

---

[10] In a table attached to its Reply, Bridgestone notes several alleged errors in its reporting and seems to advance brief, additional arguments related to some of those alleged errors.  Regarding its home market discount reporting, Bridgestone states that the "[u]nderlying credit/debit values were recorded and available in accounting records," and that "[n]o discount expense was omitted." Pl.'s Reply, Exhibit 1 at 2.  Regarding its U.S. sales destination reporting, Bridgestone proffers that "[d]elivery addresses were contained in invoices and freight documentation already on the record,"

In sum, none of Bridgestone's individual arguments regarding any single category of errors in its data is persuasive.  Given that Commerce identified numerous fundamental reporting errors in Bridgestone's information and issued multiple supplemental questionnaires affording Bridgestone an opportunity to remedy the issues, Commerce's determination that Bridgestone's information was unusable and unreliable as a whole and that Bridgestone failed to participate to the best of its ability is supported by substantial evidence and in accordance with law.

II.     **Commerce Met Its Statutory Requirement to Corroborate the Adverse Facts Available Rate**

In addition to arguing that Commerce's application of total adverse facts available is unsupported by substantial evidence and not in accordance with law, Bridgestone separately argues that Commerce failed to properly corroborate the rate it assigned to Bridgestone.  Recall that, when Commerce relies on secondary information in reaching its determination, it must "corroborate that information from independent sources that are reasonably at [its] disposal," 19 U.S.C. § 1677e(c), meaning it must examine whether it is both reliable and relevant, Ad Hoc Shrimp Trade Action Comm., 802 F.3d at 1354.  Here, Commerce "corroborated the [rate it assigned to Bridgestone] by comparing it to the individually calculated margins for Prinx . . . and found the [rate] to be within range of the highest individually calculated margins for Prinx."  IDM at 10.  Having "corroborated the [rate] to the extent practicable," Commerce found it to be "both reliable," "relevant," and "probative."  Id.

---

and that "[n]o sale was omitted."  Id. at 1.  Finally, regarding its transportation expenses, Bridgestone states that "[d]omestic freight totals were reported and verified.  The issue reflects a calculation update placement, not missing expense data."  Id. at 2.  The court does not consider these quick notes to constitute appropriately developed arguments regarding Bridgestone's reporting.  See Agile Defense, Inc. v. United States, 959 F.3d 1379, 1384 n.* (Fed. Cir. 2020) (declining to consider an argument that "the government fails to adequately develop"); Kao Corp. v. Unilever U.S., Inc., 441 F.3d 963, 973 n.4 (Fed. Cir. 2006) (declining to consider an argument made only in "glancing references").  To the extent Bridgestone suggests that any of these errors could have been remedied using "minor corrections," that argument is addressed supra Sec. I.

Bridgestone notes that "Prinx's margin was itself derived from partial [adverse facts available]." Pl.'s Br. at 34. Bridgestone argues that, by corroborating Bridgestone's rate by reference to the margin calculated for Prinx, "the rate was corroborated only against itself." Id. at 35. However, Commerce corroborated the rate it assigned to Bridgestone by comparing it specifically to Prinx's transaction-specific margins, a method upheld by the Federal Circuit in Deacero S.A.P.I. de C.V., 996 F.3d at 1300. And though Prinx's margins were calculated using facts otherwise available, they are still "independent sources" per 19 U.S.C. § 1677e(c). Recall that "[i]ndependent sources may include . . . information obtained from interested parties during the instant investigation or review." 19 C.F.R. § 351.308(d). Prinx's transaction-specific margins were grounded in Prinx's data, which is "information obtained from interested parties during the instant investigation or review." See id. Thus, by comparing the Bridgestone's rate to Prinx's transaction-specific margins and finding that it was "within range of the highest individually calculated margins," Commerce met its statutory requirement to determine that the rate was reliable and relevant.

Based on Commerce's identification of errors across a number of categories including (1) information about affiliation with GCR, (2) information about rebate programs, (3) information about discounts, (4) information about the destination of U.S. sales, (5) information about warehousing expenses, and (5) information about expenses incident to bringing the merchandise to the place of delivery, Commerce's determination that the errors in Bridgestone's reporting were pervasive, persistent, and cut across the entire record is supported by substantial evidence and in accordance with law. Commerce's determination to apply total adverse facts available is supported by substantial evidence and in accordance with law.

**CONCLUSION**

For the reasons stated above, Commerce's determination is supported by substantial evidence and is in accordance with law.  Therefore, the court denies Bridgestone's motion for judgment on the agency record and sustains Commerce's Final Determination.  Judgment will enter accordingly.

**SO ORDERED.**

/s/  Gary S. Katzmann
Gary S. Katzmann, Judge

Dated: July 22, 2026
        New York, New York